Ex parte Selma & Gulf Railroad Company.

probate court. The disposition made by the executors of this note was of their own motion, without any authority from the court. This being all the evidence, the court, at the request of the defendant, charged the jury that "if they believed the evidence they must find for the defendant." The appellant excepted, took a non-suit and bill of exceptions, with leave to set aside the non-suit in the supreme court.

JOHN M. McKLEROY, for appellant.

F. M. WOOD and D. M. SEALS, *contra*.

---

# EX PARTE SELMA AND GULF RAILROAD CO.

[APPLICATION FOR MANDAMUS.]

1. *Act amending act to regulate the publication of legal and other notices in the State of Alabama; what not repealed by.*—The act of the 10th of October, 1866, entitled, "An act to amend an act entitled an act to regulate the publication of legal and other notices in the State of Alabama," does not repeal § 830 of the Revised Code, and, therefore, a special term of a commissioners court, held by direction of the judge of probate, upon ten days notice, by advertisement in some newspaper

Ex parte Selma & Gulf Railroad Company.

in the county, or by posting up at the court-house door and two other public places in the county, notice of the same, is a lawful special term of said court.

2. *Proposal of railroad company to commissioners court ; may be made to a special term.*—A proposal of a railroad company, under the act entitled, "An act to authorize the several counties and towns, and cities, of the State of Alabama, to subscribe to the capital stock of such rail roads throughout the State as they may consider most conducive to their respective interests," approved 31st December, 1868, if it conform to the provisions of said act, may be made to a special term of a court of county commissioners, and such proposal will give said court jurisdiction to make an order to submit said proposal to the qualified electors of said county for their acceptance or rejection ; and an election duly held under such order, if it result in favor of subscription, will authorize said court to subscribe, on behalf of such county, to the capital stock of said railroad company, and to issue the bonds of such county in payment of the same.

3. *Mandamus ; when will be granted to compel subscription, &c.; what proposition gives court no jurisdiction to order election, &c.*—If said court, after such election, if in favor of subscription, refuses to subscribe for the amount of stock named in such proposal, and issue the bonds of the county in payment of the same, it may be compelled to do so by *mandamus ;* but if said proposal contains another proposition in addition, as to build a passenger and wagon bridge across a river running through said county free of toll to all the people of the State, such proposal, containing such an additional proposition, will confer on said court no jurisdiction to submit such proposal to the qualified electors of the county for their acceptance or rejection, and an order of said court, and an election held under it, will be invalid, and will give to said court no authority to subscribe to the capital stock of said railroad company, and issue the bonds of the said county in payment of the same.

4. *Same.*—An application for a *mandamus,* in such a case, to compel a court of county commissioners to subscribe to the capital stock of a railroad company, and pay for the same in the bonds of the county, will be denied.

5. *Alternative mandamus ; return to, need not be single.*—A return to an alternative *mandamus* need not be single, but may contain several causes or defenses, and if one be sufficient, a peremptory *mandamus* will not be issued.

At a former day of the term the court, on the petition and motion of the Selma & Gulf Railroad Company, granted an alternative *mandamus* to the court of county commissioners of Dallas county, commanding said court to subscribe $250,000 to the capital stock of the Selma & Gulf Railroad Company, and to issue bonds of said county in

payment of such capital stock, &c., in accordance with the proposition of petitioner, submitted to said court, and the vote of the people of Dallas county, at an election ordered thereon, and held on the 6th day of August, 1870, or else show cause on the 6th day of July, 1871, why said subscription was not made and said bonds issued according to the mandate of the writ, &c.—See *Ex parte Selma & Gulf Railroad Company*, 45 Ala. 696.

On the 3d day of July, 1871, the court of county commissioners made a return to the writ, and set up in substance the following grounds why the peremptory *mandamus* should not issue :

1. That there was no regular term or adjourned term of the court of county commissioners held on the 28th day of June, A. D. 1870, the day when the proposal or proposition of the Selma & Gulf Railroad Company for said subscription, &c., was made to said court, &c.

2. That said special term, at which said proposition, &c., was made, was begun and held by virtue of a notice published by direction of the judge of probate in the " Selma Times," (a newspaper published in said county,) on the 19th day of June, A. D. 1870, and daily thereafter until the 28th day of June, 1870, which notice, so published, was in the following words :

" COMMISSIONERS COURT.

" A called meeting of the commissioners court will be held on the 28th day of June.

JOHN F. CONOLY,

je19-dtd Judge of Probate."

On the 25th day of June, 1870, the same notice, by direction of the probate judge, was published in the "Selma Press," a newspaper published in said county. No other notice than the above was given. "Prior to the 28th day of June, 1870, and some time in 1869, the probate judge of Dallas county, in pursuance of the authority invested in him by law, had, on the 14th day of January, 1869," designated the " Selma Press," a newspaper published in the city of Selma, "as the medium through which all legal

advertisements, notices or publications of any and every character, required by law to be made in the county, should be published," and this order or designation was of force and not changed or modified in any manner at the time of said publications, and this notice was only published in the "Selma Press" until the 25th day of June, A. D. 1870·

3. That the election held in Dallas county, on the 6th day of August, A. D. 1870, on said proposition of the Selma & Gulf Railroad Company, which resulted in favor of "subscription," &c., was held under virtue of the order of the court of county commissioners, made as aforesaid on the 28th day of June, A. D. 1870.

4. The fourth ground set up is, in substance, that in the proposition of the railroad company, which was submitted to the people of Dallas county, it was agreed that the county of Dallas, represented by the court of county commissioners, and the railroad company, should have an equal voice in determining the use of the bridge by other railroad companies ; said right of the county of Dallas not to be affected or impaired by any sale, transfer or assignment of the corporate rights and franchises of said railroad company, but the right to remain intact with the county of Dallas to an equal vote upon the allowance of the use of such bridge to any other railroad, &c., and "since that time said railroad company has accepted an endorsement of its bonds from the State of Alabama under the laws in such cases made and provided, &c."

5. That the Selma & Gulf Railroad Company, in their proposition, and as a part thereof, also proposed, "that in connection with the said railroad bridge, the said company will build a passenger and wagon bridge across the Alabama river, to be free to all the people of the State of Alabama," and the said election, so held on the 10th day of August, 1870, was held on the entire proposition submitted as aforesaid, and not on any separate part thereof.

The proposal of the railroad company to the court of county commissioners and its action thereon, and the min-

utes of the court, are made an exhibit to the petition and prayed to be taken as part thereof.

The caption of the minutes of the court of county commissioners, in the record of the proceedings of that court, is as follows :

"STATE OF ALABAMA,          Court of County Commissioners,
      Dallas county.                     Special Term.

June 28th, 1870.

This being the day directed by the Honorable John F. Conoly, judge of probate of Dallas county, for the holding of a special term of the court of county commissioners for said county, and of which due and legal notice has been given by advertisement for ten days in newspapers published in Dallas county, thereupon came the Hon. John F. Conoly, judge of probate, and R. C. Goodrich, C. L. Math-thews and J. E. Kennedy, county commissioners, and the court being duly organized, opened and in session, the following proceedings were had," &c., &c.

The proposal of the railroad company was as follows :

"*To the Honorable, the Court of County Commissioners for the county of Dallas and State of Alabama :*

The undersigned, the president, and a majority of the directors of the Selma & Gulf Railroad Company, a corporate body, having a line of railroad situate upon and running through a portion of the county of Dallas, respectfully propose to the county of Dallas, to take two hundred and fifty thousand dollars, in the capital stock of said railraoad company, amounting to twenty-five hundred shares, at the price of one hundred dollars per share, to be expended in the construction of a railroad bridge across the Alabama river, at the city of Selma, and to pay for such stock, in bonds of the county, having twenty years to run, with interest at eight per cent. per annum, payable semi-annually at such place in the city of New York as may be agreed on and designated on the face of such bonds, with coupons attached, for the semi-annual interest.

" Said railroad bridge to be for the use of such other railroad companies as may be agreed on between said

Selma & Gulf Railroad Company and the county of Dallas, (each having an equal voice in determining such use,) represented by the court of county commissioners, said right of the county of Dallas not to be affected or impaired by any sale, transfer or assignment of its corporate rights, by said Selma & Gulf Railroad Company, or any sale or transfer of its railroad and appurtenances, but the right to continue intact with the county of Dallas, to an equal vote upon the allowance of the use of such bridge to any other railroad company than the said Selma & Gulf Railroad Company or its assigns.

"The undersigned further propose in behalf of said Selma & Gulf Railroad Company, that in connection with the said railroad bridge, that said company will build *a passenger and wagon bridge* across the Alabama river, to be free of toll to all the people of the State of Alabama.

(Signed,)              D. S. SMYLEY,
                  Pres't Selma & Gulf R. R. Co.
                       J. W. LAPSLEY,
                       J. W. PURIFOY,
                       WM. H. LINAN,
                       J. W. CALHOUN,
                                  Directors.

On the filing of the return the Selma & Gulf Railroad Company appeared by counsel and moved the court to quash said return, on the ground of uncertainty and insufficiency, &c., and prayed that a peremptory *mandamus* issue.

J. C. COMPTON, and PETTUS & DAWSON, *contra.*—A special term of a court is not a part of a regular term. It is entirely distinct, and the power to hold a special term must be given by statute.—20 Ala. 446 ; 6 Yerger, 395 ; 2 Scammon, 303 ; 7 Yerger, 365 ; 2 Pike (Ark.) 229 and 250.

Special terms of courts of county commissioners *must* be held in cases provided by Revised Code, § 830.

The judge of probate is made the officer to determine when any one of these requirements are to be done; one of these essential conditions must exist *ten days* prior to

the meeting of the court, for the court can only legally assemble after ten days notice given in one or the other manner required by this section of the Code. The notice in this case was published in the "Selma Times, a newspaper published in said county on the 19th day of July, and daily thereafter until the 28th day of June, 1870," on which day the court was held.

Was this notice a *ten days* notice by advertisement in some newspaper in the county as is required by section 830 of the Revised Code?—*Garner v. Nevill & Johnson*, 22 Ala. 494, and cases cited; *Owen v. Slatter*, 26 Ala. 547, and cases cited.

"One essential ingredient to the exercise of jurisdiction by any court, for the sessions of which a time is appointed by law, is, that it act within *the time* prescribed, and should it fail to do so, or presume to act at another and a different time, such acts are absolutely void."—20 Ala. 446; 1 Ala. 351; 27 Maine, 114; 1 Scammon, 227; 2 Scammon, 555; 3 Blackf. 501.

The court of county commissioners is a court of special and limited jurisdiction, and *every fact* necessary to sustain its jurisdiction must affirmatively appear on the face of its records. As a general rule nothing will be intended in favor of its jurisdiction.—Cooley's Const. Lim. page 406; 3 Phil. Evidence, 1013, 987, 1021, 1104; *Trammel et al. v. Pennington*, 45 Ala. 673, and cases there cited.

In this case we insist that it must appear that the court was called after *ten days* notice in one of the ways provided by law, by the judge of probate, *and for one of the three purposes for which such a term of the court could be held;* no intendment can assist the record to show that this special term was directed by the judge of probate to be held to "perform a special duty required by law," to-wit: to submit the proposal of the Selma and Gulf Railroad Company to the electors of the county. Their proposal was never *made* to the court, nor was it *filed* until the 28th day of June, 1870, the day on which this term of the court was held.

A record is not commonly suffered to be contradicted by parol evidence, but in the case of a court of special and limited authority, it is permitted to show a want of jurisdiction even in opposition to the recitals contained in the record.—Cooley's Const. Lim. page 407, and cases cited.

When several matters in the progress of a cause have been acted on by an inferior court, and the court ascertains before the final act in the cause that it has erred in its proceedings, it is the duty of the court, and it has the right not to proceed further; and when an effort is being made by mandamus to compel it to do the final act, it may set up in its answer or return to the superior court, all the facts concerning its previous procedure in the cause, even if it sets out in the answer or return facts which conflict with its record of the proceedings. This it may do, that the superior court may determine whether or not an error has been made in its proceedings, and whether it should be compelled to proceed with the cause.

The counsel for the motion insist that the record of the court in this case, shows that the court ascertained the preliminary jurisdictional fact, that this special term had been properly convened, and that the return of the court can not question it. This doctrine is true in regard to *third parties* and *collateral* proceedings. When the case is not determined it is otherwise.—Cooley's Const. Lim. pages 406 to 409, and cases cited.

The Selma and Gulf Railroad Company having mortgaged to the State of Alabama by its acceptance of the State endorsements of its bonds to the extent of sixteen thousand dollars per mile, its "entire road within" the State, and the franchise granted by the State or under its authority, including the right of way, grading, bridges, masonry, rails, spikes and joint fastenings, and the whole superstructure and equipments, and all the property owned by the company as incident to or necessary for its business, including depots and depot stations, and all other property real or personal belonging to said company, *or hereafter to be acquired by them*, for the payment of all of said bonds endorsed for the company."—(Acts 1869–70, page 151.)

It is insisted that this action of the railroad company was in violation of the terms of the accepted proposal made by them to the electors of the county, and that they can not enforce the payment of the subscription.

The return is not inconsistent, nor does it set out inconsistent causes why it does not obey the rule. It states the truth of the manner in which notice by the judge of probate was given, and the words of the notice, and the number of times of its publication, and in express terms negatives that notice was given in any other manner. "The return must state facts and not conclusions of law, must not be argumentative nor aver material facts by way of recital, but must positively and expressly assert, deny, or answer all facts in their full extent, the assertion, denial or avoidance of which may be for justification or defence." "It may contain several defences or justifications; and if one of these be sufficient the return must be allowed to that. It is sufficient, if it contain a legal reason for not obeying the writ, though certain facts of it are unsatisfactory; for these may be considered surplusage and the remainder tried."—Angel & Ames on Corporations, p. 709 and 710, and cases cited; Tapping on Mandamus, pages 352, 356, 357, 358; Moses on Mandamus, pages 210 and 214.

"Where the return is insufficient, the court will not ordinarily, in the first instance, order a peremptory writ, where there is the appearance of having a valid defense, but will direct the respondent to file a fuller and more perfect answer."—*State v. Jones*, 10 Iowa, 65.

ALEXANDER WHITE and S. F. RICE, for petitioner.—"The Statute of Ann. ch. 20, which allows the facts stated in the return to the alternative writ in cases of mandamus, to be traversed and tried by a jury, not being in force in this State, the facts must be pleaded with such a degree of certainty as to enable the court to decide whether they are in law sufficient to justify the party in failing to do the act."— *Com'rs Court of Tallapoosa v. Tarver*, 21 Ala. 661; 1 Har. & Johns. 557.

"Nor is a return sufficient, if it merely aver matter of fact

which the prosecutor may be able to falsify in an action on the case for a false return; because such matter should be *so particularly* alleged, that the court should be able to judge of it, and determine whether it be sufficient or not." Tappan on Mandamus, 400; Mar. 359.

In the answer or return of defendant, according to the strict rules of the common law, the same certainty is required as in indictments, returns to writs of *habeas corpus*, counts, replications, &c.—*Cullum v. Latimer*, 4 Texas, 331.

The return, to be *sufficient*, must answer the writ with the *strict* and *technical* precision required by the ancient rules of the common law. Its averments must have certainty to *every intent*, or the same as in estoppels, indictments, or returns to writs of *habeas corpus*. It must set out facts, and not state conclusions only. If it denies the supposal of the writ, the traverse must be single, direct and certain.—*Harmon v. Marshall*, 10 Maryland, 451, 466; *Brosus v. Ructer*, 1 Har. & Johns. 557; Ang. & Ames on Corp. 937; *Rex v. Ipswich*, 2 Ld. Raymond, 481.

The return must state facts and not conclusions of law, must not be argumentative, nor aver material facts by way of recital; but must *positively* and *expressly* assert, deny or answer *all* facts in their *full extent*, the assertion, denial or *avoidance* of which may be necessary for justification or defense.—Ang. & Ames on Corp. 737; *Rex v. Malden*, 1st Ld. Raymond, 481; *Rex v. Ipswich*, 2 Ld. Raym'd, 1239; *Com. Bank v. Canal Com'rs*, 11th Wise, 25.

The record of the commissioners court is made a part of the return; and it shows upon its face that the ten days notice was given and every other fact necessary to constitute this a special term. Now, if it were allowable to dispute the record, (which we deny,) it would have to be settled by this court which averments of the return to believe, those which state that ten days notice was given, or those which say it was not given in due and legal form.

Repugnancy vitiates a return, and the court will on motion quash it and award a peremptory mandamus, and notwithstanding one of the inconsistent causes would have been good of itself.—Tappan on Mand. 403, marginal, 362.

Previous to the adoption of the Code the commissioners court could only hold regular terms. Before that time, when special terms were held, they were held by virtue of special acts.

The Code was designed (section 830) to supply this omission or vacuum, which was developed by the decision of this court.— *Wightman v. Karsner*, 20 Ala. 446, in Jauuary, 1852.

Section 830, Revised Code, provides, under the head of "The Court of County Commissioners," "Special Terms, notice thereof"—

"In cases where officers are to be appointed, or vacancies supplied, or *any other* special duty required by law to be performed, a special term must be held by direction of the judge of probate, upon ten days notice by advertisement in some newspaper in the county, or by posting up at the court-house door and two other public places in the county, notice of the same."

Under this statute the judge of probate is the officer appointed by law to judge of the exigency or occasion which requires that a special term of the commissioners court shall be held, and the direction by him and the advertisement of the fact that a special term of the court will be held is a judicial ascertainment of the fact that the exigency has arisen. The cases in which the special court may be held are numerous and diversified, and are of such a character that they may arise at any time, and when they have arisen or do arise must depend upon the discretion of the judge of probate.

This discretion is put into exercise and manifested when he directs a special term to be held and gives notice of the fact. The giving the direction and the notice by him, is an adjudication of the fact upon which the organization and constitution of the court depended, and his adjudication thereon is conclusive.— *Hamner v. Mason*, 24th A. R. 480 ; *Stuyvesant v. The Mayor*, 7 Cow. 588 ; *Martin v. Mott*, 12th Wheaton, 19.

When the fact upon which the power to act depends is referred by the law maker to be determined by the court or

officer, the determination of the fact by such court or officer is *res adjudicata* and can not be questioned.—*Mason v. Hamner, supra,* citing *Wyatt's adm'r v. Rambo,* 29th A. R. 522 ; *Brittain v. Kinnard,* 1 Brod. & Bing. 432 ; *Mackaboy v. Commonwealth,* 2 Va. Cas. 269.

The record, when regular upon its face, is conclusive, though the proceedings are *ex parte.*—See cases above cited, and *Mather v. Hood,* 8 John. 36.

The jurisdictional facts being found by the court itself, in this case, and not by a jury or by any secondary instrumentality, and being put upon the record by the court, must in the very nature of the case be held to be conclusive. "It must be presumed that the court has kept a faithful record of its proceedings."—Wait's Law & Practice, vol. 2, 423.

What the law requires to be done and appear of record, can only be done and made appear by the record itself. *Elliott v. Pursol,* 1 Peters, 340.

The record of the commissioners court in this case, shows by the recitals of the record all the facts necessary to constitute it a special term, and like all other records of courts having jurisdiction, it imports absolute verity.

"If the court of limited jurisdiction is charged with the ascertainment of jurisdictional facts, and its proceedings show that these facts were ascertained, they can not be denied, because the making of the jurisdiction of the court *to depend upon a preliminary fact, implies authority to ascertain that fact.*"—*Wyatt's Adm'r v. Rambo,* 29 A. R. 524.

The court, in the case cited, proceeds further to say, "The case cited in *Wyatt v. Steele,* (26 A. R.), does not sustain it."—*Brittain v. Kinnard,* 1 Brod. & Bing. 432. (5th C. C. L. R.)

It really asserts nothing more than that *the ascertainment of jurisdictional facts, by a court of limited jurisdiction, is conclusive.*

"The general principle applicable to cases of this description is perfectly clear. It is established by all the ancient, and recognized by all the modern, authorities, and the principle is, that a conviction by a magistrate who has

jurisdiction over the subject matter is, if no defects appear on the face of it, *conclusive of the facts stated.*"—Dallas, C. J., quoted in *Wyatt & Rambo, supra,* 524.

"The proceedings of the court disclosed the jurisdictional facts, and the question was whether they could be contradicted."—*Wyatt v. Rambo, supra,* 524.

A court deciding a question within its jurisdiction can never be liable for its decision. While *unreversed it is final* and *conclusive.*—1 Talk. 396 ; 1 Ld. Raymond, 469 ; *Stuyvesant v. The Mayor,* 7th Cow. 588.

The notice in this case is given under the authority of a special act, having reference to a particular subject, and being a part of the machinery of the law by which to accomplish the end, the express object, that is, "Special Terms of the Court of County Commissioners."—Revised Code, § 830.

Before the passage of this act, the court of county commissioners could hold no special terms. This was developed by the decision of *Wightman v. Karsner,* at the January term of this court, 1852.

Section 830 of the Revised Code is a special law ; it is very far from apparent that it was the intention of the legislature to repeal it, by the act of Oct. 10, 1868 ; this section was not set out by name and repealed expressly as other sections of the amended act were, which shows that it was not intended to be repealed. To hold a special law repealed by implication, by the passage of a general law, would be contrary to the settled rule of the Supreme Court of Alabama on this subject.—29 Ala. 573.

PECK, C. J.—The return of the court of county commissioners of the county of Dallas to the alternative *mandamus* issued by this court, at a former day of this term, commanding said court to subscribe two hundred and fifty thousand dollars to the capital stock of the Selma & Gulf Railroad Company, and issue the bonds of said county in payment of said capital stock, &c., or that they show cause why said subscription was not made, &c., shows two causes

why said capital stock had not been subscribed according to the mandate of said writ.

1. It shows and states that the proposal of said railroad company to said county of Dallas, to subscribe for and take two hundred and fifty thousand dollars of the capital stock of said company, and pay for the same in the bonds of said county, was made to a special term of said court, on the 28th day of June, 1870, and not to a regular term of said court; and that said special term of said court was not a legal term of said court, held by the direction of the probate judge of said county, upon the notice required by law, and that, therefore, the order of said court to submit said proposal to the qualified electors of said county, for their acceptance or rejection, and the election held under said order, were invalid, and gave to said court no legal authority to subscribe to the capital stock of said railroad company.

2. That the said proposal of said railroad company was not a proposal authorized to be made by the act of the general assembly of this State, entitled "An act to authorize the several counties, towns and cities of the State of Alabama to subscribe to the capital stock of such railroads throughout the State as they might consider most conducive to their respective interests," approved the 31st of December, 1868, (Acts 1869, p. 514.) And that said court of county commissioners, by said proposal, acquired no jurisdiction to make an order submitting said proposal to the qualified electors of said county for their acceptance or rejection ; and that said order, and the election held under it, were invalid, and for this reason, also, said court had no authority, and should not be required by the mandate of this court, to subscribe, in behalf of said county, to the capital stock of said railroad company, and issue the bonds of said county in payment of the same.

The said court of county commissioners attach to their return, as an exhibit, and part thereof, a full certified transcript of the proceedings, &c., had in said court, on said proposal of said railroad company to said county of

Dallas for a subscription, &c., including a copy of said proposal.

On the filing of said return, said railroad company appeared in open court, by their attorney, and moved to quash said return, on the ground of its uncertainty and insufficiency, and prayed that a peremptory *mandamus* might be issued, &c.

A return to an alternative *mandamus* may contain several causes or defenses, and if either be sufficient, a peremptory *mandamus* will not be issued.—Moses on Mand. 214; *Wright v. Fawcett*, 4 Burr. 2041.

As the return in this case contains two distinct defenses or justifications on the part of said court of county commissioners, for refusing or declining to subscribe to the capital stock of said railroad company, we will consider them in the order in which they are made.

1st. Was the said special term of said court of county commissioners a lawfully convened and organized special term of said court? The said return states that it was not, and that said court was convened on a notice published in a newspaper called the Selma Times, published in the city of Selma, in said county, and not in the Selma Press, the official organ in and for said county. That the Selma Press was the official organ of said county, duly designated for that purpose by the probate judge of said county, under an act of the general assembly of this State, entitled "An act to regulate the publication of legal and other notices in the State of Alabama," approved October 10, 1868, (Acts 1868, p. 220,) and that the notice published in the Selma Times did not authorize the said court of county commissioners to hold a special term of said court, under said notice, and that said special term of said court was, therefore, held without authority of law, and that all its acts, proceedings and orders were invalid. This objection depends upon the legal effect of the said act of the 10th of October, 1868. Did said act repeal, modify or control section 830 of the Revised Code, authorizing special terms of said court to be held? If it did not, then this objection is without force. Said section 830 is in the

following words, to-wit : " In cases where officers are to be appointed, or vacancies supplied, or any other special duty required by law to be performed, a special term must be held, by direction of the judge of probate, upon ten days notice, by advertisement in some newspaper in the county, or by posting up at the court-house door and two other public places in the county, notice of the same."

This section is clearly a special law, and was not repealed by said act of the 10th of October, 1869, unless it manifestly appears, by said act, that such was the intention of the legislature. A special statute is not repealed, modified or controlled by a subsequent general act on the same subject, unless the latter clearly manifests *on its face* such an intention.—*Mobile & Ohio R. R. Co. v. The State*, 29 Ala. 573.

The act of the 10th of October, 1869, sets out thirty-two sections of the Revised Code requiring notices in the cases named in said sections, respectively, to be published, &c., and says : "All the provisions of the Revised Code, as above set forth, which are in conflict with the provisions of this act, are hereby repealed;" and then enacts that " it shall be the duty of the probate judge of each county in the State to designate a newspaper in which all legal advertisements, notices or publications of any and every character, required by law to be made in his county, shall be published, which paper, so designated, shall be the official organ in and for said county." This language is broad and general, but we think it by no means clearly manifests, on its face, an intention to repeal said section 830 of the Revised Code. If such was the intention of the legislature, why was it not named with the other sections set out in said act, and by name repealed by it? The obvious answer to this question is, that section 830 being a special law, was not intended to be repealed, modified or controlled by said act, and therefore was not set out in it. We therefore hold that the first cause, &c., stated in said return, is insufficient. Besides, the record of said court, as to the organization of said special term, states that due and legal notice had been given by adver-

tisement, for ten days, in a newspaper published in Dallas county. The said section 830 of the Revised Code not being repealed, this entry of record shows a strict compliance with its provisions as to the notice required to be given in such cases, and shows that said special term was convened on proper notice, for that purpose, and was a legal special term of said court.

2d. The second cause shown in said return is, that the proposal of said railroad company, made to said court of county commissioners for a county subscription, &c., was not a proposal authorized to be made by said act of the 31st December, 1868, and that said court, by said proposal, acquired no jurisdiction to make an order submitting said proposal to the qualified electors of said county for their acceptance or rejection, and that the order of said court, and the election held under it, were invalid, and gave to said court no authority, in behalf of said county, to subscribe to the capital stock of said railroad company, and to issue the bonds of said county in payment of the same.

The said proposal is set out in said return.

The court of county commissioners is a court of special and limited jurisdiction, and can exercise such powers only as it is specially authorized to exercise, and these powers must be exercised in the mode and manner and in the cases specified.—*Wright v. Karsner*, 20 Ala. 446.

In the case of *Trammell et al. v. Pennington et al.*, at this term, we decided that the only authority of a county to subscribe to the capital stock of railroad companies was a special statutory authority, and being a special authority, it must be strictly pursued. So we decide now. The people are permitted, under said act of the 31st December, 1868, to vote for a county to subscribe to the capital stock of a railroad company to build a railroad, and that the bonds of the county may be issued to pay for said stock ; but the statute gives no authority to the people to vote for a county to subscribe to the capital stock of a railroad company for the purpose of building *a passenger and wagon bridge* across a river, to be free of toll to all the people of

Ex parte Selma & Gulf Railroad Company.

the State. The proposal of a railroad company authorized by the statute, to a county, to subscribe to the capital stock of such company, is manifestly confined to a subscription to build a railroad. The statute gives no authority to add to the proposal something else as a make-weight to catch the people, and to induce and influence them to vote for a proposition containing two objects, one to build a railroad, and the other to build a passenger and wagon bridge across the river, or any other enterprise not connected with the building of a railroad. If that can be done who can tell which of the two objects had the greater weight with the people to induce them to vote for subscription—the building of the railroad, or the building of the bridge? Who can tell, in any given case, if the proposal had been to build a railroad merely, the people would have voted for subscription at all? It can not be told. In this case, the proposal contains two distinct propositions, the one lawful, the other unlawful. The said railroad company joined the two together in their proposal, and they can not now be separated. The whole proposal, therefore, is unlawful, and must be so declared. It is insisted by the said railroad company, that the proposal to build said bridge was for the benefit of said county. That may be so, but if admitted, it does not avoid the objection. The gist of the objection is, that the county had no authority to vote a subscription to the capital stock of said railroad company to build, or to help to build, a passenger and wagon bridge across said river, free of toll to all the people of the State. The statute only authorizes a county to vote a subscription to the capital stock of a railroad company to build a railroad, and nothing else. And furthermore, adding to said proposal the proposition to build a bridge across said river free of toll, &c., had a direct tendency, and such was no doubt its purpose, to prevent an unbiased and impartial election on the single and only question that the statute authorizes to be submitted to the suffrages of the people. For these reasons, we decide that said proposal was not such a proposal as the said act of the 31st December, 1868, permitted or authorized

the said railroad company to make, and that the said commissioners court, by said proposal, acquired no jurisdiction, by virtue of said act, to make an order to submit said proposal to the qualified electors of said county for their acceptance or rejection; and that said order, and the election held under it, were invalid, and conferred on said court no authority to subscribe to the capital stock of said company and issue the bonds of said county in payment of the same, for the purposes stated in said proposal. Consequently, the application for a peremptory *mandamus* must be denied, and the said Selma & Gulf Railroad Company will pay the costs, &c.

[NOTE BY REPORTER.—At a subsequent day of the term, the petitioner, the Selma & Gulf Railroad Company, applied for a re-hearing, and filed in support thereof an elaborate written argument, the main points of which are given below.]

ALEXANDER WHITE, in support of the petition, argued as follows:

It is admitted in the opinion, that if the application had not contained the proposal about the foot bridge, the *mandamus* would be allowed.

It is in the nature of right, that a party having the right may concede it *in whole or in part.* A right claimed or held under a special authority, can not be *extended or enlarged* by the party claiming under it; but it can be conceded, or it may be modified, provided the *modification* is clearly within the limit of the right.

The limitations which are put upon the railroad companies in this act, are, that the companies shall receive the bonds of the county for stock *at par,* and *not* any limitation as to the right of the companies to the bonds, or to the absolute control and use of them. There is nothing in the act which *requires* the company to use the proceeds of the bonds in the building of the railroad. It is implied, perhaps, that this should be done, and doubtless it would be in most, if not all cases; but it is *no term* of the con-

tract, no more than in the case of the railroad company receiving pay for stock from a private individual. The money, when paid, becomes the property of the company absolutely, and there is no contract on its part to appropriate it in any *specific* manner. It belongs to the company, and the company can do with it what, in its discretion, it thinks proper to do.

This principle, and the application of it, is recognized in the opinion in this case. Thus far the proposition is connected with the bonds of the county and the *appropriation of them* to the building of the *railroad bridge*. *That is the purpose* to which they were to be applied. To that extent the railroad company limited its right to the use of the bonds of the county, by designating the use and binding itself to that special appropriation of *the bonds—all the bonds, not a part of them*.

Here, then, is a proposal, authorized by the act of 31st of December, 1868, to the county of Dallas, made in regular form, voted upon and accepted by a large majority of the people, in accordance with the provisions of said act. It is, then, valid and legal, unless *rendered* invalid and illegal by something else in the proceedings.

Next follows a proposal by the railroad company to build *in connection with the railroad bridge*, a wagon and passenger bridge. This is a separate thing, *connected with*, but *no part* of the railroad bridge. *The people* of the county have *no part* in building this bridge, and no part in *contributing the means* necessary to building it.

The two propositions are kept distinct. That to which the county is asked to subscribe, and for which its bonds are to be given, is *the railroad bridge*.

The language is, "respectfully propose to the county of Dallas to take two hundred and fifty thousand dollars in the capital stock of said company—to be expended in the construction of a railroad bridge across the Alabama river."

The county was not asked to vote stock in the railroad company to build a wagon bridge, nor was it asked to con-

17

tribute in any way whatever for the building the wagon and passenger bridge. Such a thing was never thought of or intended by the railroad company.

The proposal of the railroad company was to build the wagon and passenger bridge out of its own means, independent of the subscription of stock in the railroad company, and as inducement to the people to vote the stock in the company, the company proposed to build the wagon bridge, not out of funds gotten from the county, for these were to be expended in the construction of the railroad bridge, but out of independent funds. The way of it is this: In the construction of a railroad bridge, the abutments, pillars and most of the other material needed for the railroad bridge can be utilized in building a wagon and passenger bridge, without interfering with the use of the bridge for railroad purposes. Hence, the expense of building such a bridge in connection with a railroad bridge, is very small comparatively, and the railroad company were willing to build this bridge if the county would aid them in building the railroad bridge.

The distinct proposition to the county, was to take so much stock in the company, to be paid for in the bonds of the county, to be expended in building a railroad bridge.

There was no proposal to subscribe stock, &c., to be used in building a wagon and passenger bridge.

Reason and right require that the railroad company be allowed to stand upon the terms of its petition. It asks for the bonds to be expended in the construction of the railroad bridge.

This being so, the people could not and did not understand that they were voting stock in the railroad company to build a wagon bridge.

The language was explicit, and it was so understood by every one who took the trouble to try to find out.

The proposition submitted to the people of the county was to take so much stock in the Selma and Gulf Railroad Company, to be paid for in bonds of the county at par.

The amount thus proposed to be subscribed, was to be

expended in the building of a railroad bridge, which, it is submitted, was legitimate.

The purpose, then, for which the county was asked to contribute, was authorized by the act of December 31st, 1868, and to this extent the proceeding is valid.

The other proposal is this: "The undersigned further propose in behalf of said Selma & Gulf Railroad Company, that in connection with said railroad bridge, that said company will build a passenger and wagon bridge across the Alabama river." It is not proposed to build said passenger and wagon bridge out of the proceeds of the bonds of the county, or by the help of the county, but it was this, and no more: If you will subscribe $250,000 to stock in the railroad company, the railroad company will expend it in the building of a railroad bridge, and will also build in connection with the railroad bridge, a passenger and wagon bridge. By the law, all that the county could get for its subscription was stock in the railroad company. It can scarcely be maintained that the contract would be vitiated by the railroad company giving it the stock, and building a bridge which would be beneficial to the county and the State.

The misapprehension, I respectfully submit, in the mind of the court is, that the proposition of the railroad company to build the wagon and passenger bridge, was to build it out of funds furnished by the county; that it was, in other words, a proposal to the county to furnish bonds for stock in the company to build the wagon and passenger bridge. That such is not the fact, will be seen by reading and comparing the two propositions. The design of the company was to separate the two propositions and make them, as they are, distinct; the one embracing specifically the appropriation of the proceeds of the county subscription to the railroad bridge, and the other being an additional undertaking by the railroad company, not out of funds obtained from the county, but from its other resources.

The proceeds of the bonds of the county are to be expended in the building of a railroad bridge. Now, if

they are expended in the building of a railroad bridge, how can they be used in the building of a wagon bridge ? And, in proposing to build the wagon bridge, the railroad company does not propose to build it of the proceeds of the county bonds. Can it be assumed that it does, in the absence of any proposition to do so, and in the face of a proposition to expend the proceeds of the bonds in the building of a railroad bridge ?

It is said, in the opinion of the court, that this proposition was unlawful, because it proposed a county subscription to a railroad company to build a common bridge. I have endeavored to show, and think I have shown, that this is a misconception of the proposal of the railroad company. It certainly does not say so in terms ; it certainly does say that the proceeds of the county subscription are to be expended upon the railroad bridge.

The rule requiring a strict construction of acts of the kind of that of 31st December, 1868, or the rule that the intendments are against courts of limited jurisdiction, do not imply a spirit of hostility to such acts, or to such courts, but only that they are special grants of power ; that the power is not presumed, but must be shown ; but in each case it is law which confers the power, and its sanction is as emphatic within the purposes of a special law and the jurisdiction of a limited tribunal, as in any general jurisdiction.

The meaning of language, the purport of statements or recitals, are to be tested by those rules which are established by law as guides in interpretation and construction.

The petition of the railroad company embraces two several propositions, distinct in subject matter and separate in form, as already stated.

The proposal of the railroad company is not that the county shall subscribe stock in the railroad company to build a wagon bridge—and thereupon it is not objectionable on that ground.

Is it illegal upon any other ground ? If so, it must be because it is prohibited by law, contrary to public policy, or vicious and immoral in itself ; for these embrace all the

grounds upon which, in a general aspect, an act can be denounced illegal.

The proposal to build the wagon and passenger bridge was by the railroad company, to be built by it, and not by the county. Now, if the people of the county had confidence in this offer of the railroad company that they would comply with this proposal, I submit whether it was not a legitimate subject for their consideration in determining whether they would vote for the subscription. It did no violence to the act under which this proceeding was authorized. It did not propose that the county should subscribe for the purpose of building this wagon bridge. The act of 31st December, 1868, does not prohibit the railroad company from presenting any and every lawful inducement to the people to vote for the subscription.

The offer of the railroad company to build the wagon bridge was simply an inducement to them to vote for the subscription to the railroad bridge, and was not a proposal to the county to build the wagon bridge, or to aid in any way whatever with its bonds in the building of the wagon bridge.

The act of December 31st, 1868, prescribes the things to be done (in cases of this kind) and the manner of doing them. It does not limit the railroad company in the legitimate inducements which it may offer to the people to vote for the subscription, nor to the manner in which it shall present those inducements; on the contrary, it contemplates reasonably the presentation of the whole question to the people, and leaves the decision to them. And in reviewing their action the law does not regard the people as incompetent, as easily gulled or deceived.

If, then, the proposition which was submitted to the vote of the people of the county to take $250,000 in stock in the Selma & Gulf Railroad Company, was authorized by the act of 31st December, 1868, and in form and substance was good, as is decided by this court, then the $250,000 bonds is to be expended in the building of a railroad bridge, and there was no contribution to be made or pro-

posed to be made by the county to build the wagon and passenger bridge.

This proposal of the railroad company, then, stands as an unnecessary and gratuitous offer by the company to build the wagon bridge. Does it operate back upon the proposal submitted to the county, proper in itself and in proper form, and complete in this respect, so as to invalidate it?

I have called the attention of the court to the features of that proposal, that it was not illegal, contrary to public policy, immoral or vicious in any sense or degree.

It does not conflict with the other proposition, neither does it add to or diminish the burthens or liabilities of the county in any way whatever, nor impair its rights under the proposed subscription. It is all good and beneficial so far as the county and the people are concerned, and casts no burthen upon any one except the railroad company, which does not seek to avoid the burthen.

The act of 31st December, 1868, having invested the county with the power to take stock in railroad companies, and the proposition having been made to the county of Dallas in conformity with the act, to take $250,000 in stock, and pay for the same in bonds, the proceeds of which were to be expended in the construction of a railroad bridge, and the proposition having been voted upon and accepted by the people of the county, it becomes a contract. It has parties competent to contract; a subject matter of contract, and an agreement between these parties relating to that subject matter.

Now, the proposal to build the wagon bridge was either valid or invalid. If invalid, it was superfluous, and could not affect the terms of a contract complete in itself and legal and binding upon both the parties to it, the railroad company and the county of Dallas. If valid, it was only binding in accordance with its terms, and in consonance with the other proposition, which obligate the railroad company to build the wagon and passenger bridge, and that without the use of any of the proceeds of the county subscription, which by the terms of the railroad company's

proposal were to be expended in the construction of the railroad bridge.

"A form was prescribed by the charter of a railroad company in which subscription to stock should be taken, and it was further provided that the company should have all the powers incident to a corporation at common law.

"A subscription followed the language of the form, and contained additional stipulations not inconsistent with those prescribed by the form, which would have been competent at common law for the parties to make. *Held*, that the subscription was valid."—*Fisher v. Evansville & Crawfordsville R. R. Co.*, 7th Ind. 407.

The proceeds of these bonds were to be expended in the building of a railroad bridge across the Alabama river at Selma. This was a part of the railroad in Dallas county, and is ruled by the court to be proper and legitimate.

A railroad subscription is a contract which the railroad company may enforce against the party subscribing the stock.—29 Ala. R. 651; 5 Ala. R. 587; Ang. & Ames on Corp. § 517; 8 Ala. R. 586.

The proposal, and the one to which alone the vote of the people had any reference, when accepted, was a legal contract by Dallas county to take 2,500 shares of stock in the railroad company.

This of itself, is unquestionably good because it is literally the thing which was authorized by the general assembly, and being *prima facie* legal and valid, it must remain of force unless it was vitiated and rendered of no effect, by some other thing done by the parties. It is the declared will of the people of Dallas county. They have expressed in the most unequivocal manner their desire to subscribe for 2,500 shares of stock in the Selma & Gulf Railroad Company, and this will, it is the duty and doubtless the desire of the court to carry into effect, unless some insuperable obstacle intervene.

The only thing which it is said invalidates this act of the people of Dallas county is, that the railroad company, at the time of proposing to the court of county commissioners that the county of Dallas should take 2,500 shares of stock

in the company, also proposed to build a wagon and passenger bridge across the Alabama river in connection with the railroad bridge. It will be borne in mind that the county subscription by the express terms of the *proposal* to the county, was to be *expended in the building of the railroad bridge ;* that this proposal was distinct and complete in itself; that it was capable of being carried out by both parties without any reference to the other proposal of the railroad company.

The county could make the subscription of stock in the company and pay for it in bonds, and the company could build the *railroad bridge* exclusive and independent of (entirely separate from) anything to be done or not done in reference to the *wagon bridge.* I do not admit that the proposal to build the wagon bridge was in any way, manner or degree illegal or immoral, *"malum prohibitum"* or *"malum in se,"* but taking it in the strongest sense against the railroad company, I propose to show that according to well established principles of law that if illegal it would not vitiate the proposal to the county to take stock in the company, and would not defeat the will of the people as expressed by their vote.

"Whenever the contract which a party seeks to enforce, be it express or implied, is expressly or by implication forbidden by the common or statute law, no court will lend its assistance to give it effect, and the test, as to whether a demand connected with an illegal transaction is capable of being enforced at law is, whether the plaintiff requires to rely on such transaction in order to establish his case?" Chitty on Contracts, title, Illegal Contracts, chapter iv. 569, and cases cited; 1 Carnes, 104; 6 Ohio, 21, 11 Serg. & R. 164; 4 Pick. 314; 11 Wheat. 258; 7 Taunt. 246; *Gunter v. Leckey,* 30 Ala. R. 595.

In this case the railroad company would be entitled to recover upon the proof that the proposal to the county of Dallas had been made through the court of county commissioners to take 2,500 shares of the capital stock of the company, and pay for the same in bonds of the county at par, and that said proposal had been submitted to the

people of the county at an election, &c., and that a majority of the people had voted in favor of the subscription. These facts all appear upon the record in this case; and upon the proof of these facts the railroad company, if it were a plaintiff at law suing upon the subscription, would be entitled to recover. It would not be necessary, nor would it even be relevant, for it to introduce proof of the proposal of the railroad company to build the wagon bridge. The proposal to give its stock for the bonds of the county was, when accepted, a sufficient consideration (and the specific consideration) designated by the act of 31st December, 1868, to sustain the contract, and all the proof needed would have been embraced in this proposal. It would not then be necessary for the railroad company to have introduced any proof about or of the offer to build the wagon bridge. It could recover without such proof, and according to the test laid down by Mr. Chitty and recognized by this court as well as others, as quoted above, the railroad company, to make out its case not having to rely on this proof, the proposal to build the wagon bridge, does not affect the validity of the proposal to take stock in the company.

The building of a wagon and passenger bridge in connection with a railroad bridge across the Alabama river, does not violate public policy or morality, nor does it contravene any prohibition of any statute.

It, then, cannot be, and is not illegal. The most that can be said of it and against it is, that the act of 31st Dec. 1868, gave no authority to make a proposition in connection with the proposal to the county to take stock in the railroad company, and being without authority of law it is void.

This is the most that can be urged against it. There is certainly nothing immoral in it, and contracts are not void on the ground of "public policy, unless they expressly and unquestionably contravene public policy, and be manifestly injurious to the interests of the State."—Chitty on Contracts, 575, title, Illegal Contracts.

The presumption of law is in favor of the legality of a

contract—and, therefore, if it be reasonably susceptible of two meanings, one legal and the other not, that interpretation shall be put upon it which will support and give it operation. Illegality of consideration shall not be inferred. Chitty on Contracts, 572; 1 B. & Ald. 471; 2 Starkie, 107; 3 East, 192.

There is no statute which prohibits the building of a wagon bridge across the Alabama river, nor would the building of such a bridge "expressly and unquestionably contravene public policy and be injurious to the interests of the State." On the contrary, building such a bridge would be beneficial to the interests of the community and the State.

It is said that it was without authority of law to propose to build it out of the proceeds of the bonds given by the county to the railroad company, or to propose to the people to vote bonds to the railroad company to build it. I answer to this, that no such proposition was made to the people of Dallas county; they had nothing to do with the expenditure of the company's money, not derived from their subscription; there was no need to ask their consent.

Under this state of facts and guided by these rules of law, which will meet with the ready assent of the court, I recur to the position that, at the most, this proposal to build a wagon and passenger bridge could only be void, because it was not authorized by the act of Dec. 31, 1868.

The first proposition is legal; it is in strict accordance with the act of the general assembly, "a proposition by a railroad company building a railroad in the county, to the county, to subscribe a certain amount of stock in the railroad company and to pay for the stock in the county bonds at par."

The other is beyond the act and without its authority, and so far as it depends upon the said act of 1868 for its validity, is void.

The consideration of the former is the stock in the railroad company, on the part of the railroad company, and the county bonds on the part of the county.

The consideration of the latter was only the proposal of

the railroad company, without any corresponding equivalent or promise by the county.

This latter being regarded as beyond the authority of the act, the question presents itself, What is its legal effect upon the other proposition ? The maxim of law "applicable to every sort of writing by which legal rights are created or transferred," is "*ut res magis valeat quam pereat.*" In the Earl of Clanricard's case, Hob. R. 227, Lord Chief Justice Hobart says, "I do exceedingly commend the judges who are cunning and almost subtle to invent reasons and means to make acts according to the just intent of the parties, and avoid wrong and injury which by rigid rules may be wrought out of the act" quoted and approved by Lord Ch. J. Hale in *Crossing v. Scudamore,* 1 Ventr. 141 ; by Willes, Ch. J., in *Roe ex dem. v. Transmarr,* (Willes' R. 682 ; 2 Wils. 75, 78).

Justice Cowen, in *Darling v. Rogers,* 22d Wend. 490, quoting Ch. J. Gibbs, says, "The truth is, there is no difference between a transaction illegal at common law and by statute, and the objection being that this deed conveys property in a way that is prohibited, whether by common law or the statute, the construction is the same. Taking it to go no further than as I now state, it follows that, that which conveys illegally is void, and that which conveys legally is valid." A statute, when it prohibits a thing, may go farther and say "that the deed by which the thing is done is void," and then a court of law must declare it void to all intents and purposes, because the legislature has said so."

If a statute does not declare that contracts made in violation of its provisions shall be wholly void, then, if the good part be separable from and not dependent on the bad, that part only will be void which contravenes the provisions of the statute.—1 Mod. 35 ; 1 Vent. 237 ; 3 Taunt. 244 ; 2 Wils. 351 ; 3 Taunt. 727 ; Chitty on Contracts, 597, 598.

"We have already seen that whenever there are two considerations, and one of them be unlawful, the promise is void ; but if one of them be only void the other will support a promise."

"The reason of this distinction is, that inasmuch as the entire consideration forms the basis of every portion of the promise in the one case, if a part of the consideration is illegal it vitiates the whole, while if a part be merely void it has no legal effect, being mere surplusage. When, therefore, the contract is severable, and there are different acts to be done, some of which are void and others are binding, the agreement may be treated as if it were composed of several distinct contracts with the same consideration, and enforced as far as it is lawful and rejected as to the residue."—Story on Contracts, ch. xix, 655, § 622 ; Addison on Contracts, 147 ; *Patton, Governor, &c., v. Gilmer and others*, 42 Ala. R. 555.

In the case under consideration the Selma & Gulf Railroad Company, engaged in the construction of a railroad in the county of Dallas, applied by its president and a majority of its directors, in writing, to the court of county commissioners of Dallas county, submitting proposals to the county to take $250,000 of stock in the railroad company and pay for the same in bonds of the county, to be expended in building a railroad bridge across the Alabama river at Selma.

Now this is literally and precisely the thing authorized by the act to be done—done by the parties and in the manner expressly authorized by the act, there is nothing wanting and no departure from the act, except in proposing to expend the bonds in building a railroad bridge, which it is decided does not vitiate.

This is a separate and independent proposal, complete of itself, and it is either legal or illegal, valid or invalid.

It is authorized by and has the express sanction of the law. The parties, the subject matter, the mode of procedure, the court before whom it is to be inaugurated, all are in strict conformity to the act of 31st of December, 1868. Under this act and on a procedure of this kind, the county receives stock in the railroad company, and the railroad company receive the bonds of the county. These are the mutual considerations fixed by the act itself which bind the parties and make the contract valid between them.

This proposal, in strict conformity to the provisions of the act, was submitted to the people of Dallas county at an election after the proper notice, and was accepted by them.

The proposal which was thus accepted by the people of Dallas was to subscribe $250,000 stock in the railroad company, and pay for it in county bonds to be expended in building a railroad bridge across the Alabama river at Selma, and when accepted by the people it became a contract which bound both the parties to it, according to its terms.

This is so obvious that language cannot elucidate or argument enforce it.

The other proposal is that the railroad company propose to build, in connection with the railroad bridge, a wagon and passenger bridge, free to all the people of the State.

This is a separate proposition from the other, not made in terms dependent upon the other, nor proposed to be built out of the funds furnished by the county. This may be stricken out and the other remains complete and entire of itself, and in full conformity with the provisions of the act.

This last proposal is not prohibited by the act of 31st of December, 1868. There is no provision in that act prohibiting the insertion of such a proposal in connection with the proposal authorized by the act. There is nothing in the act declaring that if any thing *more* than is expressly authorized by the terms of the act is engrafted upon, be attached to the authorized proposal, that either the addition shall be void or that the whole proceeding shall be void. The act is *silent* on this point, and therefore this last proposition is not made unlawful or even void by the act of December 1st, 1868.

Any implied restrictions or limitations grow out of the want of authority, and do not spring from any prohibition in the act. It is equally clear that the proposition to build the wagon and passenger bridge is not immoral, against public policy, or in violation of any other statute.

It is, then, reduced to this—that the proposal is, at most,

simply void—not unlawful or illegal, but void—because by the act which conferred the power to institute this procedure, there was no power given to the railroad company to make such a proposition, and no power given to the commissioners court to submit such a proposal to the people, and no power given to the people to accept such proposal when made.

The two propositions are several, and are separated in the form in which they are presented.

A thing which is void is ineffectual, to do or to undo. It has no power to preserve or to destroy, to cure or to kill. It is nothing. It is, to use the language of Mr. Story, quoted above, "mere surplusage." A statute which has been declared unconstitutional and void, is as though it never had any existence, and so of any act of any person or court.

When a statute is declared unconstitutional, it is as though it had never been—and what is true of an act void in toto, is true also as to any part of an act which is found to be unconstitutional, and which, consequently, is to be regarded as having never, at any time, been possessed of any legal force.—Cooley on Constit. Lim. 188; 5 Ind. 348; 3 McLean, 107.

The case, then, may be thus stated : Two proposals are submitted to the people of Dallas county, one of them legal and valid, distinct and entire in itself, by which the people are asked to subscribe to the railroad company a certain amount to be expended in the building a railroad bridge. This was exclusively the use to which the bonds of the county were to be appropriated.

The other was a proposal by the railroad company to build in connection with the railroad bridge a wagon and passenger bridge, which proposal, for want of authority in the party to make it, is void.

This proposal, being void, is a nullity. It is as though it had never been, and may be stricken out, and the case stands alone upon the first proposal.

It is said that this last proposal, though void, had its effect doubtless upon the popular vote, and therefore it is

impossible to say whether the people would have voted in favor of the first proposition had they known that the *second was void*. With great deference and sincere respect for the court, and the distinguished member of the court who proposed this position, I submit the following criticism and argument to show, not so much an error in logic as a misapprehension of the facts. That argument and conclusion of the court is *based* upon the assumption that the people of Dallas county were asked to vote a subscription of stock to the railroad company to build a wagon bridge. This I have shown is a misapprehension. Such was not the fact, as shown by the *language* of the proposal itself.

The proposal to build a wagon bridge being without authority of law, and therefore void, does not vitiate the contract, because being void it is a nullity and is to be regarded as though it had never been. It may be stricken out, and it leaves the contract perfect, legal and complete in all its parts, and in its entirety between the railroad company and the county of Dallas.

When it is said that the second proposal entered into the minds of the people at the election and influenced their vote, the answer is that the same thing may be said of every contract which contains terms, some of which are legal and valid, and others which are void. In every case the terms of the contract which are valid had probably an influence in inducing the making of the contract, yet the rule is well settled, as I have shown by authorities cited in this argument, that parts of a contract, some of which are legal and others void, will be enforced if capable of severance from those which are void.

Both of the maxims, "*Ut res magis valeat quam pereat,*" "*Utile per inutile non vitiatur,*" must be ignored before the conclusion can be sustained that the legal and valid contract contained in the first proposition is vitiated by the void proposal contained in the second.

If a corporation makes a contract valid in part and invalid as to the residue, for want of power in the corporation to make the entire contract, the contract will be valid to the extent of the power and void only as to the excess.—8 Smedes

& Mar. 151 ; 7 How. (Miss.) 508 ; 2 Ala. R. 457, 485, 486 ; 10 Peters, 453.

In reference to questions of this sort, corporations and natural persons stand upon the same footing.—*Patton, Gov. v. Gilmer,* 42 Ala. R. 554.

"Every man must be charged at his peril, with a knowledge of the law. There is no other principle that is safe or practicable in the common intercourse of mankind." Kent, Ch., *Lyon v. Richmond,* 2 I. C. 60.

This rule, applicable to individuals, must apply with equal force to a community ; and the proposition to build the wagon and passenger bridge being void, and every one being chargeable with a knowledge of the fact, it could exert no influence upon the election which the law or court can recognize, much less rest its judgment upon.

The following response was made by—

PECK, C. J.—I have carefully reviewed the opinion in this case, in connection with the argument of the learned counsel of the petitioner for a re-hearing. The argument is able and ingenious, I will not say subtle, though it comes very near it ; but it is not satisfactory. Instead of convincing me the opinion is wrong, it has the rather confirmed me that it is right.

The counsel labors skillfully to show that the proposal of the said railroad company, to-wit, the proposal to build, in connection with the railroad bridge, a passenger and wagon bridge across the Alabama river, to be free of toll to all the people of the State of Alabama, is a separate thing, connected with, but no part of, the proposal to build the railroad bridge ; that the people of the county have no part in building the passenger and wagon bridge, and no part in contributing the means necessary to build it ; that the two propositions are kept distinct ; that to which the county is asked to subscribe, and for which its bonds were to be given, was the railroad bridge ; that the county was not asked to vote stock to build the passenger and wagon bridge, nor was it asked to contribute, in any way whatever, for the building of the passenger and wagon bridge.

But the counsel concedes that the proposal of the said company to build the passenger and wagon bridge was intended as an inducement to the people to vote to subscribe $250,000 to the capital stock of said company to build the railroad bridge; yet he insists the proposal to build the passenger and wagon bridge was not illegal, contrary to public policy, immoral, or vicious, in any sense or degree. This, I think, a little reflection will show, is much easier said than proved.

It is, undoubtedly, lawful for a railroad company to make the proposal named in the statute, but to add to, or connect with such proposal, anything that is intended to induce and beguile the people to vote for such proposal, is, in my poor judgment, not only illegal, contrary to public policy, immoral and vicious, but with all, dishonest. The purpose of the said company in making the proposal to build the passenger and wagon bridge being to induce the people to vote to subscribe to the capital stock of the company, it is fair and legitimate to presume the said purpose was accomplished, and that the people would not have voted to subscribe to the capital stock of said company if this proposal to build the passenger and wagon bridge had not been made, and that they did so vote because of the said proposal of said company to build said passenger and wagon bridge. Now, I beg leave to ask the learned counsel, did or does this proposal of said company to build said passenger and wagon bridge (the vote of the people being for subscription to the capital stock of said company, induced thereto by said proposal,) impose any legal obligation on said company to build said passenger and wagon bridge,—any obligation that could or can be enforced by a court of justice? The counsel will hardly venture to answer this question in the affirmative. If no such obligation exists, then it is very certain the vote of the people for subscription was obtained by false and delusive inducements made to them by said company; in other words, the vote of the people for subscription was obtained by deceit and fraud, in law, if not in fact. It

may, perhaps, be thought these are plain words, plainly spoken ; and so they are, but plain words, plainly spoken, are always proper and becoming to a court of justice.

It is said, however, " there is no law which prohibits the railroad company from proposing to build a wagon bridge, nor any law which would prohibit it from building the bridge." This railroad company is a corporation, and as a corporation it can only lawfully do such acts as it is authorized to do by its charter, and such acts as are or may be necessary and proper to accomplish and carry into effect the objects and purposes of its creation. The building of passenger and wagon bridges, to be free of toll to all the people of the State, are not such acts as the charter authorizes it to do, nor are they necessary and proper to accomplish the objects and purposes for which it was created. It is, therefore, unlawful for it to engage in the building of such bridges, although not, in so many words, prohibited from doing so, either in its charter or some other law. Furthermore, it is not only not authorized to build such bridges, but it has not the means to build such bridges. All it possesses, or can lawfully possess, as a corporation, belongs to its stockholders, and its president and directors are merely the officers and agents of the stockholders, and bound to employ and use the means and funds of the company in the legitimate business of the company, and if they were to propose and attempt to use them in building free bridges for the use of the people of the State, on the application of one or more of the stockholders a court of equity would enjoin them from doing so.

It was, therefore, not only unlawful because unauthorized, for the president and directors of said company to make the proposal to build said passenger and wagon bridge, but it was also a proposal that they could not lawfully comply with, if even they had the will to do so. If they had not the legal power, and could not comply with said proposal, as it is very certain they could not without a breach of duty and good faith to the stockholders of said company, and without usurping powers not conferred on said company by its charter—all which said president and

directors knew, or are presumed to have known; then, to say the least of it, it was disingenuous to make such proposal to the people for the purposes admitted, to-wit, to induce them to vote subscription, &c., which they would not have done without being moved thereto by said delusive inducement.

Without consuming more time in the consideration of this subject, it is sufficient to say we remain satisfied with the decision already made, and therefore deny the application for a re-hearing. The petitioner will pay the costs of this application.